**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

FILED

03 JAN 15  AM 10: 18

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,** )<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | Civil Action No. CV-01-S-1997-NE |
| ) | |
| **JERRY DUNCAN and MARTHA M. DUNCAN,** )<br>) | |
| ) | |
| **Defendants,** ) | |
| ) | |
| **MARTHA M. DUNCAN,** ) | **ENTERED** |
| ) | |
| **Third party plaintiff,** ) | JAN 1 5 2003 |
| ) | |
| **vs.** ) | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF ALABAMA |
| ) | |
| **AMSOUTH INVESTMENT SERVICES, INC., and BRIAN T. SOUTHERLAND,** )<br>)<br>) | |
| ) | |
| **Third party defendants.** ) | |

**MEMORANDUM OPINION**

This action involves a contest between two putative beneficiaries of variable annuities[1] acquired by Cecil Duncan during his lifetime: defendants Jerry Duncan, the brother of Cecil Duncan, deceased, and Martha M. Duncan, who was married to, but divorced from, Cecil Duncan prior to his death.

Faced with competing claims for the proceeds of one of the annuities, plaintiff Hartford Life and Accident Insurance Company ("Hartford") filed an interpleader complaint pursuant to Federal

---

[1] *See Black's Law Dictionary* 88 (7th ed. 1999) (defining "annuity" as, *e.g.*, an "obligation to pay a stated sum, usu. monthly or annually, to a stated recipient"); *see also id.* at 89 (defining "variable annuity" as an "annuity that makes payments in varying amounts depending on the success of [an] investment strategy"), and 326 (defining a "variable annuity contract" as an "annuity whose payments vary according to how well the fund (usu. made up of common stocks) that backs it is performing").

Rules of Civil Procedure 22 and 57 on August 8, 2001, seeking a declaration from this court as to whom the proceeds should be paid.[2] Martha Duncan also has brought a claim of negligence against AmSouth Investment Services, Inc. ("AmSouth"), and one of its employees, Brian Southerland. The case presently is before the court on motions for summary judgment filed by Hartford, Jerry Duncan, Martha Duncan, and third-party defendants AmSouth and Brian Southerland. Also before the court is a motion filed by Jerry Duncan, seeking leave to assert counterclaims against Hartford, AmSouth, and Southerland for negligence, and against Martha Duncan for payment of the proceeds of both annuities to him.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment

---

[2]As will be explained in the following text, the two variable annuities acquired by Cecil Duncan from Hartford were assigned account numbers 210197882 and 710569162. Following his death, Hartford paid the proceeds of the first annuity (No. 210197882) to Martha Duncan without dispute and, for reasons stated herein, the proceeds of that account are not at issue. Rather, this action was precipitated by competing claims to the proceeds of the second annuity (No. 710569162).

> unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

When a court is, as here, presented cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at 335-36 (1998) (footnote omitted); *see also, e.g., Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986). The court is required to "relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment." *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

Further, when considering a motion for summary judgment, "a court may only consider evidence that is admissible or that could be presented in admissible form" at trial. *Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) (citing *Prichard v. Southern Company Services*, 92 F.3d 1130, 1135 (11th Cir. 1996) (holding that a plaintiff "cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial") (in turn citing *McMillian v. Johnson*, 88 F.3d 1573, 1583-84 (11th Cir. 1996) (same)); *see also, e.g., Victoria L. by Carol A. v. District School Board*, 741 F.2d 369, 373 (11th Cir. 1984) ("In adjudicating a motion for summary judgment, a court may consider any evidence that would be

admissible at trial.") (citing *Roucher v. Traders & General Insurance Co.*, 235 F.2d 423, 424 (5th Cir. 1956) ("[E]vidence inadmissible on a hearing of the case would generally be inadmissible on a motion for summary judgment, except that the court may hear the matter on affidavits . . . .")); *Broadway v. City of Montgomery*, 530 F.2d 657, 661 (5th Cir. 1976) ("Evidence [that is] inadmissible at trial cannot be used to avoid summary judgment."); *Soles v. Board of Commissioners of Johnson County*, 746 F. Supp. 106, 110 (S.D. Ga. 1990) ("The court may consider only that evidence that would be admissible at trial.").

Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that the motions for summary judgment filed by Jerry and Martha Duncan are due to be denied, but the motions filed by Hartford, AmSouth and Brian Southerland are due to be granted. For reasons explained hereafter, Jerry Duncan's motion for leave to amend will be denied.

## I. FACTUAL BACKGROUND

### A.    First Variable Annuity — Account No. 210197882

Cecil Duncan ("Cecil") purchased his first variable annuity from Hartford on January 19, 1996, fully two years before his marriage to Martha Duncan ("Martha"). He purchased that annuity through Brian Southerland, an investment sales representative employed by AmSouth. Southerland also was an agent for Hartford.[3]   Cecil designated his brother, Jerry Duncan ("Jerry"), as the

---

[3]Doc. no. 29 (Martha Duncan's Motion for Summary Judgment), Ex. B (deposition of Brian Southerland), at 8; *see also* doc. no. 33, Ex. A, at 1-6.

   *Nota bene*: an explanation of the immediately preceding citation — "doc. no. 33, Ex. A, at 1-6" — is in order. A useful collection of documents was presented by Jerry Duncan, in the form of exhibits to the proposed counterclaim that is the subject of his motion for leave to amend. The motion was assigned document number ("doc. no.") 33 when it was stamped by the Clerk as "filed." The proposed counterclaim and its referenced exhibits — a separate, spiral-bound collection of papers — were not assigned a document number by the Clerk (as, of course, it could not be, until such time as this court ruled upon Jerry Duncan's motion for leave to amend). Even so, photostatic copies of documents submitted to, and mailed by, Hartford are bundled underneath a tab labeled "Exhibit A" to the proposed counterclaim. (Exhibit "B" to the proposed counterclaim is a photostatic copy of the transcript of proceedings in the Circuit Court for Pickens County, Alabama, on April 14, 2000, in the action styled *Martha M. Duncan v. Cecil D. Duncan*, Case No. DR99-65.)

beneficiary of this annuity.[4]  Southerland submitted the application and other documentation to Hartford.  In turn, Hartford assigned number 210197882 to the account, and mailed Cecil a description of benefits,[5] as well as a transaction confirmation statement.[6]  Both documents were dated February 1, 1996.

### 1.    First change of beneficiary

Cecil married Martha on February 12, 1998.  The union was brief and "stormy,"[7] but the bloom endured at least nine months because, on November 19, 1998, Cecil requested, by means of an "annuity change request" form promulgated by Hartford, that the beneficiary for account number 210197882 be changed from Jerry to Martha.[8]  Hartford confirmed that this change had been recorded by means of a document dated November 30, 1998.[9]

### 2.    Second change of beneficiary

Five months later, however, Cecil removed Martha as beneficiary of his first annuity, and reinstated Jerry.  Notably, this change request form was not dated.[10]  Nevertheless, Hartford acknowledged the change in beneficiary for account number 210197882 on April 20, 1999.[11]

---

The various documents collected under the "Exhibit A" tab are *not* separated by numbered tabs, however.  For that reason, it is difficult to discern where one document ends, and another begins.  Indeed, the only means of segregating one from another is by reference to numbers, *handwritten* in the lower right-hand corner of each page.  Therefore, when providing footnote references to this batch of documents in the text that follows, the court has adopted the following shorthand citation form: "Doc. no. 33, Ex. A, at [relevant handwritten page number(s)]."

[4]Doc. no. 33, Ex. A, at 1, ¶ 5 ("Beneficiary (ies) Designated").

[5]*Id.* at 4-5.

[6]*Id.* at 6.

[7]*See id.* at 72 (copy of final decree of divorce reciting, in paragraph 1, that:  "The parties are both senior citizens.  They were married on February 12, 1998, and separated for the last time on July 2, 1999, a span of less than seventeen months.  It appears to have been a stormy marriage, with more than one separation.").

[8]*Id.* at 7.

[9]*Id.* at 8.

[10]Doc. no. 33, Ex. A, at 9.  Note also that the requested change is inexplicably handwritten as: "From: Martha M. Duncan To: Jerry Duncan – *spouse*."  (Emphasis supplied.)

[11]*Id.* at 10.

5

### 3.    Third change of beneficiary

Within a month of the foregoing switch, Cecil signed yet a third request for change of beneficiary on his first annuity, removing Jerry and reinstating Martha.  Once again, the change request form signed by Cecil was not dated, but it did include an account number (210197882).[12] Hartford confirmed that the change had been recorded for that account on May 11, 1999.[13]

### B.    Second Variable Annuity — Account No. 710569162

Cecil purchased a second variable annuity from Hartford in the amount of $118, 349.99 on April 9, 1999, approximately one year and two months after his marriage to Martha.  Again, Cecil purchased this annuity through Southerland and AmSouth, and he designated Jerry as beneficiary of the account.[14]  It should be observed that this transaction occurred eleven days prior to the date on which Hartford acknowledged Cecil's second change in beneficiary for his first annuity (*i.e.*, April 20, 1999) — removing Martha and reinstating Jerry — discussed in Section II(A)(2) above. Hartford assigned number 710569162 to this account, and sent a transaction confirmation statement to Cecil on April 13, 1999.[15]

### C.    Cecil Pours More Money Into His First Annuity Account

On the same date that Hartford mailed a transaction statement to Cecil, confirming his purchase of the second annuity, *i.e.*, April 13, 1999, Cecil deposited an additional $18,209 into his first annuity account, number 210197882.[16]  This transaction was acknowledged by Hartford two

---

[12]*Id.* at 55; *see also* doc. no. 27 (Third-Party Defendants' Motion for Summary Judgment), Ex. D.

[13]Doc. no. 33, Ex. A, at 57; *see also* doc. no. 42 (Hartford Life & Accident Insurance Company's Motion for Summary Judgment), Ex. 1.

[14]Doc. no. 33, Ex. A, at 16; *see also* doc. no. 27 (Third-Party Defendants' Motion for Summary Judgment), Ex. C.

[15]Doc. no. 33, Ex. A, at 20.

[16]*Id.* at 56.

days later, on April 15, 1999.[17]

**D.      Cecil's Fourth, Undesignated, Change-of-Beneficiary Request Form**

The record contains an additional beneficiary change request form signed by Cecil, requesting a change of beneficiary from Jerry to Martha.  This form is notable for two deficiencies:  it is not dated, and, it does not specify by account number the annuity for which the change was intended.[18]

Notwithstanding those deficiencies, Hartford interpreted the document as a request to change the beneficiary of the second annuity, account number 710569162; and, on May 11, 1999 — the same date on which Hartford acknowledged that the beneficiary for account number 210197882 had been changed from Jerry to Martha (*see supra* Section II(A)(3)) — Hartford likewise acknowledged that the beneficiary for account number 710569162 had been changed from Jerry to Martha.

**E.      Divorce, Execution of Cecil's Will, and Death**

Martha filed a complaint for divorce in the Circuit Court for Pickens County, Alabama, on July 26, 1999.[19]

Two months later, on September 22, 1999, Cecil executed a will.  The pertinent provision of that testament reads as follows:

> I give, devise, and bequeath a life estate in which all of the property which [sic] I may own at the time of death, real, personal and mixed, tangible and intangible, of whatsoever nature and wheresoever situated, to Jerald Westley Duncan ["Jerry"] and Joan Carol Duncan for as long as either of them live.  Upon the demise of the last survivor of Jerald Westley Duncan and Joan Carol Duncan, I give and devise the remainder of said property to Ashley Kristen Duncan and Nicole Renee Duncan in equal shares.  Should either Ashley Kristen Duncan or Nicole Renee Duncan predecease me, that predeceased child's share shall pass to her then living issue, if any, and if none, then the whole thereof shall pass to the survivor of the two if living

---

[17]*Id.* at 52.

[18]Doc. no. 27 (Third-Party Defendants' Motion for Summary Judgment), Ex. F.

[19]Doc. no. 33, Ex. A, at 60-64.

and if not, to her or their then living issue.  Should both Ashley Kristen Duncan and Nicole Renee Duncan not survive me, then I bequeath and devise the said property in fee to such persons as would be entitled to inherit the same, from me under the laws of the State of Alabama then in force, had I died at said time a resident of the State of Alabama intestate and owned said property.[20]

A final decree of divorce was entered by the Circuit Court of Pickens County, Alabama, on May 12, 2000.[21]  Cecil appealed the trial court's judgment to the Alabama Court of Civil Appeals, however, and Cecil and Martha's divorce did not become final until November 29, 2000, when the parties executed an "agreement to dismiss appeal."[22]

Less than four months later, on or about March 18, 2001, Cecil departed this life.  Cecil's death was discovered when a friend, Robert Marlowe, became concerned because he had not seen Cecil for several days.  Marlowe contacted a Pickens County Sheriff's Deputy, who accompanied him to Cecil's house, where they discovered his body.[23]

**F.    Conflicting Claims to the Proceeds of the Second Annuity and Suit**

Hartford sent benefit election forms for each of the two annuity accounts to Southerland, for delivery to Martha, on April 24, 2001.[24]  Martha returned the forms to Hartford on May 17, 2001.

The proceeds of the first annuity, account number 210197882, were paid to Martha without objection.

Hartford also issued a second check to Martha on June 21, 2001, drawn in the amount of $93,619.15, and representing the proceeds of the second annuity, account number 710569162.[25]  On

---

[20]*Id.* at 68.

[21]*Id.* at 72-76.

[22]*Id.* at 79-81.

[23]Doc. no. 44, Ex. 2.

[24]Doc. no. 29 (Martha Duncan's Motion for Summary Judgment), Exs. H & I.

[25]Doc. no. 27 (Third-Party Defendants' Motion for Summary Judgment), Ex. B, at 44-45.

the day preceding that action, however — *i.e.*, on June 20, 2001 — Jerry had filed a claim for the proceeds of that account.[26]  When Hartford awoke to the existence of conflicting claims, it stopped payment on the check issued to Martha.  That occurred on June 22, 2001.[27]  Hartford filed this action on August 8, 2001, interpleading the proceeds of account number 710569162.

## II. DISCUSSION

**A.    Jerry Duncan's Motion for Leave to Amend**

On May 17, 2002 — *i.e.*, nine months after this action was filed,[28] four months after the deadline for amendments to the pleadings specified in this court's first scheduling order,[29] and following the expiration of the discovery deadline specified in the court's second, amended scheduling order[30] — Jerry filed a motion for leave to amend in order to bring counterclaims against Hartford, Martha, AmSouth, and Brian Southerland, and to join the action in his representative capacity as personal representative of Cecil's estate.  All other parties oppose the motion.[31]  The Federal Rules of Civil Procedure provide that:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served.  Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed. R. Civ. P. 15(a).  The Supreme Court has provided the following guidance for district courts when considering whether an amendment to the complaint will be permitted under the foregoing

---

[26]Doc. no. 44 (Evidentiary Submission in Support of Motion for Summary Judgment), Ex. 1.

[27]Doc. no. 27 (Third-Party Defendants' Motion for Summary Judgment), Ex. B, at 44-45.

[28]*See* doc. no. 1 (Complaint filed August 8, 2001).

[29]Doc. no. 18 (scheduling order entered on January 10, 2002).

[30]Doc. no. 25 (amended scheduling order entered on March 27, 2002).

[31]*See* doc. no. 35.

9

rule:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).

As grounds for his motion, Jerry first asserts that his brother died alone in his home on or about March 18, 2001, but that the exact date of death was not determinable. Even if the court could ascertain the relevance of this fact, Jerry has been aware of it since shortly after March 18, 2001, more than four months before this action was filed.

Jerry next contends that, when he first entered Cecil's home following his death, all of his brother's documents were either missing or in disarray. Jerry does not indicate when this event occurred, or how it is relevant to the assertion of counterclaims against the other parties.

Finally, Jerry states that his attorney has been required to interview numerous witnesses, insurance agents, accountants, attorneys, and to obtain various records, in order to assert counterclaims. These statements simply do not excuse Jerry's delay in asserting his claims, or outweigh the prejudice to the other parties if the amendment is permitted. *See, e.g., McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1309 (11th Cir. 1999) (district court did not abuse its discretion in denying leave to amend the complaint where plaintiff sought leave two months after the deadline for amendment had passed, the dispositive motion deadline was one month away, plaintiff and defendant's representative had been deposed, and plaintiff had knowledge of the information contained in the proposed amendment when she filed the complaint). Accordingly, the court

concludes that the motion for leave to amend is due to be denied.

**B.      Motions for Summary Judgment**

Martha contends that, pursuant to the provisions of the second annuity contract, the proceeds of that account (number 710569162, discussed in Section II(B) *supra*) should be paid to her as the beneficiary of record pursuant to the fourth beneficiary change request form acknowledged by Hartford on May 11, 1999 (discussed in Section II(D) *supra*).

In response, Jerry argues that, because the fourth beneficiary change request form was not dated and did not specify the account to which it related, Hartford improperly recorded a change of beneficiary for account number 710569162 from Jerry to Martha, and that he accordingly is entitled to the proceeds of that account as the prior beneficiary of record. Alternatively, Jerry contends that Cecil subsequently intended to designate him as the beneficiary of both annuities.

Martha alleges in her third-party complaint that, if Jerry's first contention is accepted, AmSouth and Southerland were negligent in failing to effect the change of beneficiary by improperly completing the annuity change request form for account number 710569162, and that, likewise, Hartford's actions were negligent. Hartford, AmSouth, and Southerland all contend that the annuity request form satisfied the contractual requirements for a change of beneficiary, that the beneficiary of record was Martha, and that she is entitled to the proceeds of the annuity.

This controversy turns on the interpretation of an annuity contract. Hartford is a Connecticut corporation, Martha Duncan is a citizen of the State of Alabama, Jerry Duncan is a citizen of the State of Florida, and the action was commenced in this district. Thus, there is complete diversity of citizenship, and, the requisite jurisdictional amount is in controversy. *See* 28 U.S.C. § 1332(a)(1). The Supreme Court commands that, where diversity is the basis for jurisdiction, the district court

11

is to apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021-22, 85 L. Ed. 1477 (1941).

Alabama's choice of law rule provides that "the law of the state wherein the contract was executed is determinative of the rights and liabilities of the parties to the contract." *Harrison v. Insurance Company of North America,* 318 So. 2d 253, 257 (Ala. 1975) (citing *Furst & Thomas v. Sandlin*, 208 Ala. 490, 94 So. 740 (1922)). Although this action involves an annuity contract, legal principles applicable to insurance contracts are relevant. *See, e.g., Ex parte Pitts*, 435 So. 2d 83, 85 (Ala. 1983) ("[T]he similarities between an annuity or other life insurance policy and a pension system justify applying the rule governing the effect of divorce on a life insurance contract to the facts of the present case."). *Cf. Walden v. Walden*, 686 So. 2d 345, 346 (Ala. Civ. App. 1996) (applying life insurance principles to conclude that dissolution of marriage had no legal effect upon the designation of the wife as the beneficiary of the proceeds of her ex-husband's individual retirement account).

"In the context of insurance cases, the court is obliged to apply the laws of the state where the last act is 'receipt and acceptance' of the insurance policy." *American Motorists Insurance Co. v. Southern Security Life Insurance Co.,* 80 F. Supp. 2d 1280, 1282 (M.D. Ala. 2000) (citing *Brown Machine Works & Supply, Inc. v. Insurance Company of North America, Inc.,* 951 F. Supp. 988 (M.D. Ala. 1996)); *see also Industrial Chemical & Fiberglass Corp. v. North River Insurance Company*, 908 F.2d 825, 829 n.3 (11th Cir. 1990) (applying Alabama's choice of law rule, and holding that the receipt and acceptance of the policies by the insured, the last act necessary to the policies' execution, occurred in New York).

The application for the Hartford annuity was taken in Alabama. The annuity contract

expressly provides that it "is subject to the laws of the jurisdiction where it is delivered."[32]  The

contract was delivered to Cecil in Alabama.  Thus, under Alabama choice of law rules, the court

must apply the substantive law of the State of Alabama to this dispute.

### 1.    The efficacy of the undated, undesignated change of beneficiary form

Under Alabama law, "the designation of a beneficiary of a life insurance policy, including

the changes thereof, are governed [in the first instance] by the provisions of the policy itself."

*Zeigler v. Cardona*, 830 F. Supp. 1395, 1398 (M.D. Ala. 1993) (citing *Gibson v. Henderson*, 459

So. 2d 845, 847 (Ala. 1984) ("Generally, the designation of the beneficiary of a life insurance policy

is governed by the provisions of the policy itself.").

Here, the annuity contract required only that written notice of a change of beneficiary be

*received* by Hartford.  The pertinent provision of the second annuity contract relating to changes in

beneficiaries reads as follows:

> The Designated Beneficiary will remain in effect until changed by the Contract
> Owner.  Changes in the Designated Beneficiary may be made during the lifetime of
> the Annuitant by written notice to the Administrative Office of the Company.  If the
> Designated Beneficiary has been designated irrevocably, however, such designation
> cannot be changed or revoked without such Beneficiary's written consent. *Upon
> receipt of such notice* and written consent, if required, at the Administrative Office
> of the Company, the new designation will take effect as of the date the notice is
> signed, whether or not the Annuitant or Contract Owner is alive at the time of receipt
> of such notice.  The change will be subject to any payments made or other action
> taken by the Company before the receipt of the notice.[33]

### a.    Insurer's waiver of strict compliance with its policy requirements

Jerry's argument that the beneficiary change request form bearing neither a date nor account

number (*see supra* Section II(D)) was ineffective to change the beneficiary of the second annuity

---

[32]Doc. no. 27 (Third-Party Defendants' Motion for Summary Judgment), Ex. E, at 1.

[33]*Id.* at 7 (emphasis supplied).

from himself to Martha is unpersuasive. Strict compliance with policy requirements regarding a change of beneficiary may be waived by an insurance company. *See, e.g., Zeigler*, 830 F. Supp. at 1398 (citing *Whitman v. Whitman*, 225 Ala. 113, 142 So. 413 (1932) (holding that "the method of changing the beneficiary as per the terms and method prescribed by the policy is not the exclusive method of doing so as between the insured and the beneficiaries, and a failure to do so in strict compliance with the policy may be waived by the company")).

Indeed, the Alabama Supreme Court has often observed that "[t]he provisions in an insurance policy which prescribe the requirements for changing the beneficiary of the policy are for the sole benefit and protection of the insurance company. *If the insurance company does not take advantage of the requirements for such a change, neither can anyone else.*" *Gibson v. Henderson*, 459 So. 2d 845, 849 (Ala. 1984) (Adams, J., dissenting) (emphasis supplied) (citing *Whitman v. Whitman, supra*); *see also, e.g., Murphy v. Gibson*, 465 So. 2d 373, 376 (Ala. 1985) (holding that "an insured may change his beneficiary without abiding by the specified requirements of his policy . . . if the insurer waives the requirement"); *Norton v. Norton*, 280 Ala. 307, 312, 193 So. 2d 750, 754 (1966) (holding that "limitations in a policy as to the method of changing the beneficiary are solely for the benefit of the company"); *Phillips v. Phillips*, 240 Ala. 148, 198 So. 132, 133-34 (1940) (holding that the provisions of a life insurance requiring a change of beneficiary to be in writing executed by the insured and presented to the insurer were "for the protection of the insurer" and, accordingly, "may be waived"); *Missouri State Life Ins. Co. v. Robertson Baking Co.*, 223 Ala. 13, 134 So. 25 (1931) (holding that a limitation on the right of an insured to assign a life insurance policy "is solely for the benefit of the company, and, *if it does not take advantage of it, no one else may do so*") (emphasis supplied); *McDonald v. McDonald*, 212 Ala. 137, 102 So. 38, 41 (1924) (holding that the

requirements of a life insurance policy for change of beneficiary could be waived by the company).

Hartford explained its actions, changing the beneficiaries on both annuities from Jerry to Martha on May 11, 1999, in the following manner: the company received two beneficiary change request forms from Cecil; neither form was dated, but one included an account number (210197882),[34] while the other did not;[35] however, Cecil owned only two Hartford annuities; moreover, the second annuity had been purchased less than a month before;[36] accordingly, Hartford concluded that Cecil intended to change the designated beneficiary on both annuities.

Accordingly, even assuming the contract explicitly required Cecil to date and reference the account number on a beneficiary change request form, Hartford waived strict compliance by its actions. It should be observed, however, that the *language* of the second annuity contract provision relating to a change of beneficiary does not require that the annuitant supply either the contract number, or even utilize a form provided for that purpose by the company;[37] rather, it provides that "Changes in the Designated Beneficiary may be made during the lifetime of the Annuitant by *written notice* to the Administrative Office of the Company. . . . *Upon receipt of such notice . . . at the Administrative Office of the Company*, the new designation will take effect *as of the date the notice*

---

[34]*See supra* notes 12 and 13 and accompanying text (*i.e.*, section II(A)(3) of this opinion).

[35]*See supra* note 18 and accompanying text (*i.e.*, section II(D) of this opinion).

[36]Defendant Brian Southerland, the AmSouth employee with whom Cecil dealt exclusively in connection with his Hartford annuities, speculated during his deposition that the beneficiary request form may have omitted reference to the account number assigned by Hartford to his second annuity, because Cecil only recently had acquired that annuity, and the contract had not yet been assigned an account number. (*See* doc. no. 27 (Third Party Defendants' Motion for Summary Judgment), Ex. B (deposition of Brian Southerland), at 35.) That explanation has a surface plausibility. Standing alone, however, it could not reasonably account for Hartford's actions, because it does not dovetail neatly with these facts: Cecil purchased his second annuity on April 9, 1999; and, on April 13, 1999, Hartford mailed a transaction confirmation statement to Cecil bearing account number 710569162 (*see supra* section II(B)). The foregoing events occurred almost one month before May 11, 1999, the date on which Hartford acknowledged that the beneficiaries of both annuities had been changed from Jerry to Martha (*see supra* sections II(A)(3) and (D)).

[37]*Cf. Gibson v. Henderson*, 459 So.2d 845, 848 (Ala. 1984) ("Here the policy provides that the insured may change his beneficiary at any time '*by filing written notice thereof on such form with the Employer.*'") (emphasis in original).

15

*is signed*, whether or not the Annuitant or Contract Owner is alive at the time of receipt of such notice."[38] Thus, Cecil's failure to date either "written notice" acknowledged by Hartford on May 11, 1999, was the only omission of potential consequence under the pertinent contract language, but that omission affected only the date on which "the new designation [took] effect." Moreover, Cecil substantially complied with contract requirements by providing "written notice to the Administrative Office of the Company" of his desire to change the beneficiary on each annuity from Jerry to Martha.

The foregoing discussion also disposes of Martha's counterclaims against AmSouth, Southerland, and Hartford for negligence, and those counterclaims are due to be dismissed. Even assuming those parties owed Martha a duty to exercise reasonable care, which is at best doubtful, the court cannot conclude that there was a breach of any such duty.

### b.    Insurer's waiver by filing interpleader

An insurance company's failure to take advantage of policy provisions prescribing the requirements for changing beneficiaries is not the sole manner in which such contract requirements may be waived. In addition, "[w]here an insurance company interpleads life insurance proceeds, it is held to have waived requirements under the policy as to the change of beneficiary." *Zeigler*, 830 F. Supp. at 1398 (citing *McDonald v. McDonald*, 212 Ala. 137, 102 So. 38 (Ala. 1924)). This rule rests upon the notion that policy requirements and formalities function primarily to protect the insurance company from double liability and, "because the interpleader action serves the same protective purpose, strict construction of the contract becomes unnecessary." *Fidelity Bankers Life Insurance Co. v. Dortch*, 318 N.C. 378, 383, 348 S.E.2d 794, 798 (1986). The Alabama Supreme Court addressed this issue in *Phillips v. Phillips*, where the insurance company declined to take sides

---

[38]Doc. no. 27 (Third-Party Defendants' Motion for Summary Judgment), Ex. E, at 12 (emphasis supplied).

between claimants to the proceeds of a disputed life insurance policy by interpleading the funds.

> The policy contained the usual provisions requiring change of beneficiary to be in writing executed by the insured and presented to the insurer.
>
> This provision, as we have often held, is for the protection of the insurer, may be waived, and is waived, when the insurer, as in this case, takes the position of a stakeholder, leaving the claimants to litigate their claims as between themselves. *Missouri State Life Ins. Co. v. Robertson Banking Co.*, 223 Ala. 13, 134 So. 25; *Whitman v. Whitman*, 225 Ala. 113, 142 So. 413; *McDonald et al. v. McDonald*, 212 Ala. 137, 102 So. 38, 36 A.L.R. 761.
>
> A life insurance policy held by the insured on his own life[] is a chose in action,[39] which like a chattel may be the subject of a gift.  When the right to change the beneficiary is reserved, the named beneficiary has no vested right before the death of insured, and a change of beneficiary, as between claimants, may be made by gift of the policy to another than the named beneficiary, with the intent to presently pass the title to the donee, and made the donee beneficiary of the policy.  Such a gift may be made by words and acts without writing.  A completed gift must appear in this as in other gifts of chattels.  *McDonald v. McDonald et al.*, 215 Ala. 179, 110 So. 291.

*Phillips*, 240 Ala. at ___, 198 So. at 133-34; *see also, e.g., Murphy v. Gibson*, 465 So. 2d at 376

(holding that "an insured may change his beneficiary without abiding by the specified requirements

of his policy, which require that the change be noted thereon, if the insurer waives the requirement,

and an interpleader by it is such a waiver"); *Peoples v. Peoples*, 527 So. 2d 1288, 1290-91 (Ala.

1988) (holding that, by filing an interpleader action, the insurance company "therefore waived any

requirement that the change of beneficiary be effected in accordance with the provisions of its

insurance contract"); *Gibson v. Henderson*, 459 So. 2d at 849 ("[W]hen the insurer interpleads the

---

[39]As one respected legal lexicographer has observed, "chose" is a Law French word meaning "a thing," but in modern legal writing it connotes a personal chattel.

> Traditionally, *choses* are of two kinds.  *Choses in possession* are tangible goods capable of being actually possessed and enjoyed (e.g., books and clothes); *choses in action* are rights that can be enforced by legal action (e.g., debts or causes of action in tort. . . .  The phrase *chose in action* is sometimes anglicized *thing in action*. . . .

Bryan A. Garner, *A Dictionary of Modern Legal Usage* 112 (1987) (emphasis in original).

proceeds of a life insurance policy and chooses not to take sides between claimants, the insurer waives strict compliance with policy requirements by the insured.") (Adams, J., dissenting) (citing *McDonald v. McDonald*, 212 Ala. 137, 102 So. 38, 41 (1924) (holding that policy requirements for a charge of beneficiary "were waived when the defendant company brought the fund into court for an adjudication between the plaintiff and appellants as to the merits of their respective claims")); *Missouri State Life Ins. Co. v. Robertson Baking Co.*, 223 Ala. 13, 134 So. 25 (1931) ("[W]e have held that a change of beneficiary may be effectual without a notation by the insurer on the policy, though the policy requires that such change be so noted by it, if the insurer waives the requirement, and that an interpleader by it is such a waiver.") (citing *McDonald v. McDonald, supra*).

"Under those decisions, an insured may change his beneficiary without abiding by the specified requirements of his policy . . . if the insurer waives the requirement, *and an interpleader by it is such a waiver.*" *Murphy v. Gibson*, 465 So. 2d at 376 (majority *per curiam* opinion) (emphasis supplied) (citing *Norton* and *Phillips, supra*).

By interpleading the proceeds of the second annuity, therefore, Hartford has waived compliance with contractual beneficiary change requirements. Thus, under Alabama law, "the trial court . . . is free to determine the beneficiary, based on a determination of the intention of the insured." *Murphy v. Gibson*, 465 So.2d at 378 (Adams, J., concurring) (citing *Whitman v. Whitman*, 225 Ala. 113, 142 So. 413 (1932)). In *Whitman*, the Alabama Supreme Court held that a court may consider in such circumstances whether the insured effected a beneficiary change by parol or writing. *Whitman*, 225 Ala. at 113, 142 So. at 413.

The Court took an apparently short-lived detour from that approach, however, in *Gibson v. Henderson*, 459 So. 2d 845 (Ala. 1984). There, Bob Carl Long, who was an insured under a group

18

life insurance policy acquired from his employer, the Singer Company, completed a beneficiary

change request form, removing the name of his mother, who had predeceased him, and designating

Patricia Henderson as replacement beneficiary. However, he "neither mailed nor otherwise delivered

the form to his employer or the insurance company." *Id.* at 846. Following Long's death, Patricia

Henderson found the change of beneficiary form in his desk, and delivered it to the insurance

company.  The company delayed paying the claim, and ultimately filed an interpleader action,

because Vera Gibson, Long's aunt and administratrix of his estate,

> claimed that because the original beneficiary under the policy had died and the
> change of beneficiary form had not been delivered to the Singer Company either by
> Bob Long or someone else acting under his direction, there was no named
> beneficiary, and Long's estate was the proper recipient of the policy proceeds.

*Id.*  In reversing the trial court's determination that Henderson was entitled to a judgment as a matter

of law, the majority held that

> the beneficiary in an insurance policy may be effectively changed if [the] insured
> substantially complies with the provisions of the policy for such a change of
> beneficiary.  The test of substantial compliance is whether the insured has done
> everything that he could do to make the change.

*Id.* at 849 (quoting *Manhattan Life Insurance Co. v. Barnes*, 463 F.2d 629, 633 (9th Cir. 1972)).

However, that doctrine, and the holding in *Gibson v. Henderson*, appears to have been overruled *sub*

*silentio* in *Murphy v. Gibson*, 465 So. 2d 373 (Ala. 1985).

In *Murphy v. Gibson,* the dispute over interpled insurance proceeds was between the wife of

the deceased (Mrs. Bettie Murphy) and his former live-in girlfriend (Mary Barnes, later known as

Mary Gibson).  The deceased, Nasren Murphy, designated Mary Barnes/Gibson as the beneficiary

of his employer's pension plan benefits on May 26, 1977.  He married Bettie Murphy about two

years later, on January 25, 1979.  *Id.* at 375.  Nasren Murphy never formally changed the beneficiary

19

of his employer's pension plan benefits prior to his death. Even so, there was evidence that he "said a million times everything he had was willed to his wife." *Id.* There also was conflicting evidence to the effect that, about one week prior to his death, Nasren Murphy's brother, Frank Murphy, learned that Mary Barnes/Gibson was still listed as the beneficiary of his profit sharing trust, and told Nasren "you ain't got your business fixed right." Nasren replied that "he had Mary's name on it, he was going to let it stay on there." *Id.* The trial court ruled in favor of Mary Barnes/Gibson, and the Alabama Supreme Court affirmed. In a special concurring opinion, stating his "happ[iness] that [the Court had] once again embraced our old decisions," thereby overruling *sub silentio* the contrary decision in *Gibson v. Henderson*, Justice Adams wrote:

> The instant case is remarkably similar to *Gibson*. Here, the insurance company interpleaded the proceeds of the policy and the trial court found that the insured first made his beneficiary his live-in girlfriend, following the procedure outlined in the policy, then changed it by parol to his wife, then changed it back by parol to his live-in girlfriend. In the instant case, we hold that he can do so. This is perfectly consistent with our previous case law . . . . But, if we had continued to follow the rationale in *Gibson*, we would have had to hold that the insured had not *changed* his beneficiary as found by the trial court, because he had not done all in his power to comply with the terms of the policy, either when he purportedly changed the beneficiary to his wife, or back to his live-in girlfriend. This is true, because in each instance he could have, but failed to make the change on forms of the company.

*Id.* at 377-78 (Adams, J., concurring) (emphasis in original).

Accordingly, Jerry's alternative contention — *i.e.,* that Cecil *subsequently* intended to change the beneficiary of the proceeds of his second annuity from Martha to Jerry — bears discussion. Jerry has presented the following evidence to support his contention: (1) the will that Cecil executed during September of 1999, devising and bequeathing all of his property, both tangible and intangible, to Jerry and his wife; (2) the affidavit of Cecil's friend Robert Marlowe, relating statements made

by Cecil about his annuity;[40] (3) Jerry's affidavit, in which he states that Cecil telephoned him during September of 1999, and told him that he (Cecil) intended to leave all his property to Jerry and Jerry's wife, including the proceeds of his annuities;[41] and, (4) state court records relating to Cecil's and Martha's divorce proceedings. In opposition, Martha proffers only her own affidavit, stating that she and Cecil had reconciled by the time of his death.[42]

### (i) Jerry's and Martha's competency to testify as to Cecil's statements

In diversity cases, where state law provides the substantive law of decision, "the admissibility of evidence is governed by federal law." *Borden v. Florida East Coast Railway Company*, 772 F.2d 750, 754 (11th Cir. 1985). The Federal Rules of Evidence provide that:

> Every person is competent to be a witness except as otherwise provided in these rules. *However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.*

Fed. R. Evid. 601 (emphasis supplied).

As a beneficiary under Cecil's will, Jerry is an interested survivor. At one time under Alabama law, and providing certain other conditions were met, that status arguably could have precluded testimony as to statements by, or transactions with, the deceased. *See* Charles W. Gamble, *McElroy's Alabama Evidence* § 102.01 (5th ed. 1996), at 466 (discussing Alabama Code § 12-21-163 (1975), commonly known as the "Dead Man's Statute").[43] That prohibition was abrogated,

---

[40]Doc. no. 44 (Evidentiary Submission in Support of Motion for Summary Judgment), Ex. 2.

[41]*Id.*, Ex. 1.

[42]Doc. no. 48 (Third Party Plaintiff and Defendant Martha Duncan's Response to Jerry Duncan's Motion for Summary Judgment).

[43]In full text, Alabama Code § 12-21-163 reads as follows:

> In civil actions and proceedings, there must be no exclusion of any witness because he is a party or interested in the issue tried, except that no person having a pecuniary interest in the result of

however, by the adoption of Alabama Rule of Evidence 601, effective January 1, 1996, which

provides that "[e]very person is competent to be a witness except as otherwise provided in these

rules." Ala. R. Evid. 601; *see also* Gamble, *supra*, at 467. The commentary to the rule specifically

states the following:

> This rule supersedes any inconsistent statutory grounds of incompetency. Chief among these is Alabama's Dead Man's Statute. Superseding the Dead Man's Statute means that survivors will be allowed to testify, if their testimony otherwise complies with the rules of evidence, and that the unavailability of the deceased person will be merely a factor for the jury to consider in determining the weight to give the survivor's testimony.

Ala. R. Evid. 601 Advisory Committee Comments (1998) (citations omitted).

Moreover, even though he is a legatee under Cecil's will, Jerry does not assert his claim to

the proceeds of the annuity based on that status. The Alabama Supreme Court held in *Jennings v.*

*Jennings*, 250 Ala. 130, 33 So. 2d 251 (1947), that the proscription of the Dead Man's Statute did

not apply in an action between two rival claimants to the proceeds to an insurance policy. On the

second appeal in that action, the Court reconsidered its "holding in regard to the admission of certain

. . . on the former appeal" — specifically, that the Dead Man's Statute precluded

> the donee of the policy . . . from testifying as to any statement made by or transaction with the insured regarding its delivery to her because, as construed, the insured's estate was interested in the result of the suit, the rationale being that under the rule that the statute applies to protect those claiming in legal succession to the deceased, the same as the estate of the deceased when the other conditions exist, . . . the

---

the action or proceeding shall be allowed to testify against the party to whom his interest is opposed as to any transaction with, or statement by, the deceased person whose estate is interested in the result of the action or proceeding or when such deceased person, at the time of such transaction or statement, acted in any representative or fiduciary relation unless called to testify thereto by the party to whom such interest is opposed or unless the testimony of such deceased person in relation to such transaction or statement is introduced in evidence by the party whose interest is opposed to that of the witness or has been taken and is on file in the case. No person who is an incompetent witness under this section shall make himself competent by transferring his interest to another.

Ala. Code § 12-21-163 (1975).

> designated beneficiary in the policy[] stood in such succession and should be
> considered in the same aspect as a legatee under a will, thereby rendering [the
> donee's] testimony on the question incompetent under the statute.

*Id* at 132, 33 So. 2d at 254. "On further mature consideration," the Alabama Supreme Court

"reached the view that this interpretation of the statute was laid in error and should be overruled."

*Id*. The Court held that one of the claimants, the named beneficiary of the policy, was outside the

purview of the statute because she did *not* assert her claim as an heir, widow, devisee, or successor-

in-interest to an interest *in the estate of the decedent*, but instead based her claim upon

> *a sum of money due from the insurance company.* The difference between (1) a
> designated beneficiary in a policy of insurance, whether or not there is reserved a
> right to change the beneficiary or whether or not such beneficiary has contract rights
> or equities in the insurance, and (2) a legatee in a will with no such contract rights,
> is that as to the former the insurance is not part of the estate of the insured, is not
> subject to administration and, except for fraud, not subject to payment of debts. . . .

*Id*. at 133, 33 So. 2d at 254 (emphasis added) (citation omitted). Thus, the Dead Man's Statute did

not preclude the testimony of the rival claimant as to statements made by the deceased. *See also*

*Norton v. Norton*, 280 Ala. 307, 312, 193 So. 2d 750, 754 (Ala. 1966) (under the rule announced in

*Jennings*, the testimony of the rival claimant to the insurance proceeds was not precluded).

Accordingly, it is clear that neither Jerry nor Martha are barred from testifying as to statements of,

or transactions with, Cecil — as long as such testimony otherwise would be admissible at trial.

> (ii)   **Admissibility of hearsay statements in affidavits proffered by**
>        **Jerry**

The next issue the court must resolve, therefore, is whether the testimony relating to certain

statements allegedly made by Cecil contained in the affidavits proffered by Jerry — his own, and that

of Robert Marlowe — would be admissible at trial, notwithstanding the fact that it is hearsay.

"Hearsay testimony cannot be considered because a third party's description of a witness' supposed

testimony is 'not suitable grist for the summary judgment mill.'" *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)).

The Federal Rules of Civil Procedure require that affidavits submitted in opposition to a motion for summary judgment "shall be made on personal knowledge,[44] shall set forth such facts as would be *admissible in evidence*, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e) (emphasis supplied).[45] Thus, the evidence upon which a non-moving party may rely when opposing summary judgment must be "admissible in evidence" at trial. *See, e.g., Victoria L. by Carol A. v. District School Board*, 741 F.2d 369, 373 (11th Cir. 1984) ("In adjudicating a motion for summary judgment, a court may consider any evidence that would be admissible at trial."); *Samuels v. Doctors Hospital, Inc.*, 588 F.2d 485, 486 & n.2 (5th Cir. 1979);[46] *Broadway v. City of Montgomery*, 530 F.2d 657, 661 (5th Cir. 1976) ("Evidence [that is] inadmissible at trial cannot be used to avoid summary judgment."); *Roucher v. Traders & General Insurance Co.*, 235 F.2d 423, 424 (5th Cir. 1956) ("[E]vidence inadmissible on

---

[44] Thus, affidavits based on "information and belief" are not competent evidence. *See Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831, 70 S. Ct. 894, 896, 94 L. Ed. 1312 (1950); *see also Roucher v. Traders & General Insurance Co.*, 235 F.2d 423, 424 (5th Cir. 1956) ("For affidavits to be admissible on motion for summary judgment, they must be 'made on personal knowledge.'").

[45] In full text, Fed. R. Civ. P. 56(e) provides that:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

[46] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

a hearing of the case would generally be inadmissible on a motion for summary judgment, except that the court may hear the matter on affidavits. . . ."); *Soles v. Board of Commissioners of Johnson County, Georgia*, 746 F. Supp. 106, 110 (S.D. Ga. 1990) ("The court may consider only that evidence that would be admissible at trial."); *see also, e.g., Wright-Simmons*, 155 F.3d at 1268 ("'It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.'") (quoting *Gross v. Burggraf Construction Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995)).

Even so, the evidence need not be in an admissible *form* when presented in opposition to the motion for summary judgment. As the Eleventh Circuit has observed, "*otherwise admissible* evidence [may] be submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (emphasis in original) (citing *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1017 (11th Cir. 1987) (Edmondson, J., concurring)[47]), *aff'd on other grounds sub nom. Millian v. Monroe*

---

[47] The panel majority in *Offshore Aviation* relied upon the following language from the Supreme Court's opinion in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), to hold that inadmissible hearsay evidence may be considered when ruling upon a motion for summary judgment:

> We do not mean that the nonmoving party must produce evidence in a *form* that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the non-moving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

*Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553-54 (emphasis supplied); *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1015 (11th Cir. 1987) (per curiam). Judge Edmondson filed a separate opinion, concurring in the judgment reached in *Offshore Aviation*, but emphasizing that the quoted passage from *Celotex* merely clarifies the non-moving party's right to oppose a summary judgment motion with any of the materials listed in Rule 56(c), including affidavits of that party's own witnesses that may contain testimony in a "form" not admissible at trial:

> I doubt ... that inadmissible hearsay can be properly used to oppose summary judgment, especially if it is not shown that admissible evidence to the same effect will be available at trial.
>
> . . .
>
> Probably, the Supreme Court was only emphasizing [in the quoted passage from *Celotex*] that

*County, Alabama*, 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997).

In other words, while otherwise admissible evidence may be submitted in an inadmissible form in opposition to a motion for summary judgment — *e.g.*, in the form of an affidavit containing hearsay statements — if that hearsay would not be admissible if offered at trial, then it may not be used to defeat summary judgment.[48]

The court concludes that the hearsay statements contained in the affidavits proffered by Jerry fall within the hearsay exclusion of Federal Rule of Evidence 803(3),[49] and they would be admissible

---

otherwise admissible evidence can be submitted in the shape of an affidavit at the summary judgment stage, although at trial such a document would be inadmissible and, instead, a live witness or deposition would have to be used to present the evidence. ...

*Offshore Aviation*, 831 F.2d 1016-17 (Edmondson, J., concurring).

[48] *See generally* Schwarzer, Hirsch & Barrans, The Analysis and Decision of Summary Judgment Motions (Federal Judicial Center 1991), providing that:

> The facts on which the nonmovant may rely must be admissible at trial, but need not be in admissible form as presented in the opposition. ...

> To permit an opposition to be based on evidence that would not be admissible at trial would undermine the goal of the summary judgment procedure to prevent unnecessary trials, since inadmissible evidence could not support a jury verdict. A distinction must be drawn, therefore, between the affidavit of a party's own witness — which can be converted into admissible testimony at trial — or an opponent's admission, and a statement reciting the testimony of an independent or adverse witness that would be barred as hearsay. (The testimony of such a witness would normally have to be submitted in the form of a deposition.)

> Of course, a nonmovant's mere promise to produce admissible evidence will not suffice to defeat summary judgment. And unauthenticated documents or hearsay evidence should not be considered without adequate assurance that their contents can be proved by admissible evidence at trial. To overcome these evidentiary hurdles, the nonmovant may resort to discovery under Rule 56(f) to convert inadmissible evidence into admissible form or to discover admissible evidence.

*Id.* at 50-51 (footnotes omitted).

[49] This exception to the rule against hearsay provides:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3).

at trial to show Cecil's then existing state of mind. This conclusion is consistent with decisions of the Alabama Supreme Court that have held, without discussion, that testimony regarding the statements of the deceased is admissible for the purpose of determining whether a change of beneficiary has been effected by parol. *See Peoples v. Peoples*, 527 So. 2d at 1290 (testimony regarding statements made by deceased allowed to establish whether insured had effected a parol change of designation of life insurance benefits); *Murphy v. Gibson*, 465 So. 2d 373, 376 (Ala. 1985) (witnesses testified as to statements made by deceased regarding his intent to make inter vivos gift of pension plan death benefits to a person other than the named beneficiary); *Norton v. Norton*, 280 Ala. at 312, 193 So. 2d at 754 (same, regarding life insurance proceeds); *Jennings v. Jennings*, 250 Ala. at 133, 33 So. 2d at 254 (same); *Phillips v. Phillips*, 240 Ala. at ___, 198 So. at 134 (same).

This action bears the most factual similarity to *Murphy v. Gibson*. Here, as in *Murphy,* there is evidence that Cecil, like the insured, Nasren Murphy, said many times after his divorce from Martha that he intended to make his brother and sister-in-law the beneficiaries of his entire estate. He even executed a will leaving a life estate in all of the property which he might own at the time of death, "real, personal and mixed, tangible and intangible, of whatsoever nature and wheresoever situated," to Jerry and his wife. Even so, as in *Murphy v. Gibson*, Cecil never sought to change the beneficiaries last designated on either annuity from Martha to Jerry "by written notice to the Administrative Office of the Company." There is no evidence here, however, as there was in *Murphy*, that the fact that the beneficiary of record for the second annuity remained Martha was brought to Cecil's attention, and that he affirmed that he intended for her to receive those proceeds. *Cf. Murphy*, 465 So. 2d at 365 (after brother of insured told insured "you ain't got your business fixed right," insured replied that "he had Mary's name on it, he was going to let it stay on there.")

Thus, *Murphy* is not dispositive.

Instead, the court is confronted with conflicting evidence as to whether Cecil intended for Jerry, or for Martha, to be the beneficiary of the proceeds of his second annuity. Cecil's will contained only general testamentary statements, and did not specifically state that he intended for his brother and sister-in-law to be the beneficiaries of his annuity contracts. The divorce decree does not address the issue of the annuity's beneficiary, stating only that: "Defendant brought into the marriage a separate estate consisting primarily of approximately $200,000.00 in mutual funds."[50] While the execution of a will by Cecil leaving his entire estate to his brother and sister-in-law, and the fact of his divorce from Martha, are not legally sufficient to effect a change of beneficiary, those events are relevant to a determination of his intent in that regard. Moreover, Jerry has proffered his own affidavit testimony, as well as that of Cecil's friend, Robert Marlowe, that Cecil did not intend for Martha to be the beneficiary of the annuity.

In contrast, another view of the evidence is that Cecil intended for Martha to be the beneficiary, in view of Martha's statement that she and Cecil had reconciled prior to his death,[51] and because he was aware of the annuity's contractual requirements for beneficiary changes, and had, in fact, changed his beneficiary in accordance with those provisions on several occasions. The court therefore finds that there are genuine issues of material fact, such that summary judgment is not appropriate.

---

[50]Doc. no. 33, Ex. A, at 72.

[51]Without passing on the credibility of this statement, as the court is forbidden to do in the context of a motion for summary judgment, the court observes that the statement was made for the first time in opposition to Jerry's motion for summary judgment. *See* Doc. no. 48 (Third Party Plaintiff and Defendant Martha Duncan's Response to Jerry Duncan's Motion for Summary Judgment). She apparently did not testify about this fact during her deposition.

### III. CONCLUSION

In light of the foregoing, the court concludes that the motions for summary judgment filed by Jerry Duncan and by Martha Duncan are due to be denied. The motions for summary judgment filed by Hartford, AmSouth, and Brian Southerland are due to be granted. The motion for leave to amend filed by Jerry Duncan will be denied. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _15th_ day of January, 2003.

_____
United States District Judge